AO 91 (Rev. 11/11) Criminal Complaint

AUSA Matthew Madden (312) 886-2050
AUSA Erika Csicsila (312) 353-5370

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

APR 1 8 2015

4-14-15

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

RAJINDER SACHDEVA

CASE NUMBER:
**UNDER SEAL**

**15 CR 191**

**MAGISTRATE JUDGE COX**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or around January 2010 until on or about the present, at Cook County, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 666(a)(1)(B) | being an agent of an organization that receives in excess of $10,000 in federal funds in any one-year period, corruptly solicited, demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $ 5,000 or more, in violation of Title 18, United States Code, Section 666(a)(1)(B) |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

*Daniel McCune*

DANIEL MCCUNE
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: April 14, 2015

*Judge's signature*

City and state: Chicago, Illinois

SUSAN E. COX, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, DANIEL MCCUNE, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation, and have been so employed for 19 years. My current responsibilities include the investigation of white collar crime and public corruption offenses, including mail, wire, and bank fraud, and related offenses.

2.     This affidavit is submitted in support of a criminal complaint alleging that RAJINDER SACHDEVA has violated Title 18, United States Code, Section 666(a)(1)(B). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SACHDEVA with bribery concerning a federally funded program, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, information provided to me by PACE employees, information provided to me by a cooperating witness, and based on my review of PACE records and financial records.

4.     As set forth below, the FBI is investigating SACHDEVA, an employee of PACE, a suburban transit provider. The investigation has revealed that

SACHDEVA has violated 18 U.S.C. § 666(a)(1)(B) by corruptly demanding, accepting, and agreeing to accept gratuities and kickbacks, intending to be influenced and rewarded in connection with the hiring and continued employment of information technology ("IT") contractors at PACE via outside vendors. SACHDEVA concealed payments that he received, either by obtaining payments through Company B, which employed the IT contractors and in which SACHDEVA's wife possessed an interest, or by obtaining payments directly from the IT contractors. According to bank records, SACHDEVA, via his wife or his consulting company, Aatek Consulting, was paid in excess of $280,000 between 2010 and 2014 in exchange for the influence he exerted in placing certain IT contractors at PACE and in their continued employment at PACE.

## Background on PACE and SACHDEVA

5.     PACE, the Suburban Bus Division of the Regional Transportation Authority, provides transit services in the suburbs of Chicago.  The services include bus service, vanpools, and dial-a-ride programs. PACE's service area covers six counties: suburban Cook, DuPage, Kane, Lake, McHenry, and Will.  PACE also provides Americans with Disabilities Act transit services in both Chicago and the suburbs.  In 2013, PACE had a total ridership of over 39 million people.

6.     Based on information from the United States Department of Transportation, and as set forth in PACE's annual financial reports, PACE relies in part on federal funding. For example, in 2014, PACE received more than $30 million in federal grants, including grants from the Federal Transit Administration.

In 2013, PACE received more than $35 million in capital grant reimbursement from the Federal Transit Administration and $300,000 from the Federal Emergency Management Agency. Similarly, in 2012, PACE received more than $30 million in capital grant reimbursements from the Federal Transit Administration and $2 million from the Federal Emergency Management Agency. In 2011, PACE received more than $19 million in capital grant reimbursements from the Federal Transit Administration. In 2010, PACE received more than $30 million in federal grants.

7.     SACHDEVA, a PACE employee since January 2010, is the Department Manager of Applications at PACE. In this role, SACHDEVA supervises PACE employees in the Applications Department, and oversees the implementation and performance of Oracle at PACE. Oracle is an enterprise information technology used by PACE to support its different business units, such as human resources, accounting, purchasing, payments, and grant writing.

8.     PACE also contracts with outside vendors that provide Oracle IT support. In his role as Manager of Applications, SACHDEVA was involved in naming subordinate PACE employees to the purchasing committees that evaluated proposals from outside vendors bidding on PACE IT contracts. Between 2008 and the present, outside vendors Synchronous Solutions, Senryo Technologies, and Bourntec Solutions were awarded contracts with PACE to provide IT support. Between 2010 and the present, IT contractors working for these outside vendors provided on-site or remote IT support to PACE. Currently, PACE has numerous contractors providing on-site IT support and numerous contractors providing

remote IT support. In addition to supervising the PACE employees in the Applications Department, SACHDEVA also supervises the IT contractors providing support to PACE, which involves reviewing and approving their timesheets.

9.     Employees of PACE are governed by rules of personal conduct. As set forth in the rules, PACE employees are prohibited from accepting fees, gifts, or gratuities, or other valuable items in the course of employment, and are prohibited from engaging directly or indirectly in any other business or employment without prior written permission of the Executive Director of PACE. According to PACE guidelines, new employees are provided copies of the state's ethics ordinance prohibiting gifts and conflicts of interest in contracting procurement, and they acknowledge receipt thereof via a signed form. PACE employees are also provided with annual ethics training.

### Company B

10.     According to the Illinois Secretary of State ("ISOS") website, Company B was incorporated during 2007 and involuntarily dissolved in 2011. The ISOS website lists Individual A as the President of Company B.

11.     During early 2015, law enforcement interviewed a Cooperating Witness ("CW"), and he agreed to cooperate. Individual A is the wife of the CW. The CW is cooperating in the hope that he will either not be charged as a result of this investigation or that he will receive a lesser sentence if he is charged. Based on my review of his criminal history, the CW does not have any criminal convictions. As

set forth below, information provided by the CW has been corroborated by financial and other records.

12.     According to the CW, who has known SACHDEVA since approximately 2006, the CW and another individual started Company B in approximately 2007. According to the CW, Company B was intended to be an IT training company, though it provided no training services until approximately 2009, after SACHDEVA joined the company. According to the CW, when SACHDEVA joined Company B in approximately June 2009, he made approximately $4,902 in capital contributions to the company and became a silent partner under SACHDEVA's wife's name. The CW said that Company B had limited success as a training business and that SACHDEVA trained fewer than approximately 25 students between 2009 and 2011, possibly extending into early 2012.

### SACHDEVA Arranged for Company B to Hire Contractor A to Perform PACE Work

13.     According to the CW, after SACHDEVA joined PACE in January 2010, SACHDEVA wanted to expand Company B by hiring IT contractors. SACHDEVA also wanted IT support at PACE. According to the CW, SACHDEVA said that Company B should hire an IT contractor, Contractor A, who could then be hired out to PACE vendor Synchronous Solutions, which had a contract with PACE for IT support. The CW agreed with SACHDEVA, and in approximately January 2010, Company B hired Contractor A. Then, according to PACE records and bank records, between approximately January 2010 and approximately June 2011, Contractor A was hired out to Synchronous Solutions to perform IT support at PACE. According

to PACE records and bank records, in July 2011, Contractor A began performing the same IT services for PACE as a subcontractor to a different outside vendor, Senryo, which had by that time secured a contract with PACE for IT support services. Contractor A worked at PACE under Senryo until June of 2013.

14. According to the CW, shortly after Contractor A was hired by Company B, the CW submitted Company B invoices to Synchronous Solutions for the IT support work performed by Contractor A at PACE. In turn, Synchronous Solutions then billed PACE, which paid Synchronous Solutions on the invoices. Synchronous Solutions then made a payment to Company B, a portion of which was paid to Contractor A through Contractor A's consulting company, Company A.[1]

15. The CW said that within about six months of starting to work for Synchronous Solutions, Contractor A became increasingly unhappy with the billing arrangement. According to the CW, Contractor A eventually told the CW that he did not want to bill PACE through Company B anymore. The CW said that Contractor A continued to work at PACE after Company B stopped submitting invoices for him.[2]

16. The CW later, in the spring of 2013, learned from SACHDEVA, in connection with replacing Contractor A at PACE with Contractor B, that SACHDEVA was taking a cut of the contractors' pay for the work they performed at PACE (see *infra* paragraph 26).

---

[1] According to the Illinois Secretary of State website, Contractor A was Company A's registered agent, and Contractor A's wife was its President.

[2] According to e-mail records, Contractor A reported his hours worked at PACE to Company B until at least approximately July 2010.

## Financial Records Reflect Payments
## from Contractor A to SACHDEVA

17.     Financial records obtained by law enforcement demonstrate that SACHDEVA received payments from Contractor A through Contractor A's company, Company A, between 2010 and 2013. Specifically, financial records reflect that Company A paid a company associated with SACHDEVA,[3] Aatek Consulting Services, Inc., more than $218,000 between July 2010 and November 2013. The payments from Company A to Aatek Consulting coincide with the time period that Contractor A provided IT support to PACE.[4] The chart below summarizes the money deposited annually into Aatek Consulting's bank account from Company A and the Company A payments to Aatek Consulting:

| Year | PACE Vendors' Payments to Company A | Company A Payments to Aatek Consulting |
|---|---|---|
| 2010 | $68,350 | $16,550 |
| 2011 | $211,983 | $54,765 |
| 2012 | $278,053 | $89,782.50 |
| 2013 | $181,896 | $57,165 |
| TOTAL | $740,282 | $218,262.50 |

---

[3] I believe that SACHDEVA is associated with Aatek Consulting Services, Inc. because, according to the ISOS website: (1) SACHDEVA's wife was the registered agent and President of Aatek Consulting; and (2) Aatek Consulting's address is also the address of a residence owned by SACHDEVA in Schaumburg, Illinois. According to the ISOS website, Aatek Consulting was involuntarily dissolved in December 2014.

[4] The timing of the payments also overlaps with the time period that another contractor, Contractor D, was performing remote IT support to PACE through the outside vendor Senryo. *See* paragraph 43. Bank records reflect that Contractor D's payments from his PACE work via Senryo were being funneled through Company A, too.

## SACHDEVA Exerted Influence Over
## The Decision to Hire Contractor A at PACE

18.   The CW provided law enforcement with copies of e-mails sent or received by the CW. As more specifically set forth below, the e-mails show that SACHDEVA exerted influence over the decision to hire Contractor A at PACE through outside vendor Synchronous Solutions, and that Company B (specifically the CW) submitted invoices to Synchronous Solutions for work performed by Contractor A during 2010.

19.   According to PACE records, in November and December 2009, SACHDEVA was one of Synchronous Solutions' consultants and worked on the PACE IT support contract. Also according to PACE records, SACHDEVA's first day of employment at PACE was January 4, 2010.

20.   Before SACHDEVA left his consulting position with Synchronous Solutions, on or about December 28, 2009, SACHDEVA, using rajsach@gmail.com, e-mailed Synchronous Solutions's senior technical recruiter and advised the technical recruiter that "this week will be my last week at PACE [as one of Synchronous Solutions' consultants]" and that he was accepting employment at "another company." SACHDEVA then offered to help Synchronous Solutions find a replacement for him at PACE.

21.   On or about January 4, 2010, the senior technical recruiter responded to SACHDEVA's e-mail and stated, "Any help that you can give finding a replacement would be great. Please let me know any leads you may have."

22. On or about January 4, 2010, SACHDEVA, using rajsach@gmail.com, e-mailed the senior technical recruiter, attaching Contractor A's resume. SACHDEVA then forwarded the e-mail to the CW and instructed the CW to call the senior technical recruiter regarding Contractor A. Subsequent e-mails show that Contractor A was hired by Company B, and that Synchronous Solutions approved Contractor A to work as a Synchronous Solutions contractor at PACE.

23. On or about January 11, 2010, SACHDEVA, using rajsach@gmail.com, e-mailed the CW, using info@intelliorbit.com, and told the CW that he was looking for an additional consultant to hire through Company B to work at PACE. More specifically, SACHDEVA wrote, "I am looking for one more consultant very soon .... from Company B thru Senryo."

24. The e-mails also reflect that during 2010, Contractor A sent his timesheets to the CW at Company B, and CW then invoiced Synchronous Solutions for work performed by Contractor A. Further, consistent with information provided by the CW, the CW e-mailed Synchronous Solutions on July 4, 2010, indicating that Contractor A would no longer work for Company B and would work directly for Synchronous Solutions. Approximately three weeks later, the first direct payment was sent from Company A, Contractor A's company, to Aatek Consulting, SACHDEVA's company. Specifically, on or about July 26, 2010, a $3,000 Company A check was deposited into Aatek Consulting's bank account.

25. According to the CW, during several conversations in approximately spring of 2013, Contractor A told the CW that Contractor A was not comfortable

working at PACE, that Contractor A was not comfortable working with SACHDEVA, and that Contractor A wanted to stop working at PACE as soon as possible. According to the CW, at some point in 2013 after these conversations, Contractor A stopped working at PACE and started a new job. Contractor A subsequently moved to India.

### Payments to SACHDEVA After Contractor B Provided IT Support at PACE

26.     The CW told law enforcement that during approximately 2013, Contractor B took over the IT support services previously performed by Contractor A at PACE. At that time, SACHDEVA told the CW that SACHDEVA wanted his share for placing people at PACE. SACHDEVA specifically stated that Contractor B was only getting the job because of SACHDEVA's efforts. The CW told SACHDEVA he was not comfortable with the arrangement, but SACHDEVA persisted and told the CW that was how things worked.

27.     The CW told law enforcement that Company B hired Contractor B to serve as a subcontractor to Senryo, which at the time had a contract to provide IT support to PACE. The CW prepared the Company B invoices for Contractor B's work at PACE based upon the timesheets that Contractor B submitted to the CW. The CW then submitted the invoices to Senryo, which in turn submitted invoices to PACE. PACE paid Senryo on the invoices, and Senryo in turn paid Company B, which paid Contractor B a lesser amount. According to the CW, SACHDEVA received payments from Company B related to Contractor B's work at PACE via

checks from Company B to Aatek Consulting or to SACHDEVA's wife, who was a signatory on and maintained a checkbook for the Company B bank account.

28.     The financial records corroborate information provided by the CW regarding payments made to SACHDEVA based on Contractor B's PACE work. Based on my review of e-mails and PACE records, Contractor B started at PACE in June 2013. Financial records reflect that, between August 2013 and October 2014, Senryo paid Company B no less than $246,000 for the work of Contractor B. Financial records also reflect that Company B paid Aatek Consulting over $37,000 between June 2013 and December 2013. The Company B checks to Aatek Consulting during this time period are signed in the name of SACHDEVA's wife. Financial records further reflect that Company B paid SACHDEVA's wife over $27,000 between February 2014 and July 2014. According to the CW, SACHDEVA's wife performed no services for Company B in 2013 or 2014, and other than the return of SACHDEVA's outstanding $4,294 capital contribution, any money passed to SACHDEVA's wife or Aatek Consulting between 2013 and 2014 represented SACHDEVA's cut of PACE consultants' pay. In total, between June 2013 and July 2014, Company B paid SACHDEVA (through Aatek Consulting) and his wife over $64,000.

29.     According to the CW, during November 2014, SACHDEVA requested that the CW give SACHDEVA $2,800 in cash from the Company B bank account. SACHDEVA said that it was SACHDEVA's share of the PACE paychecks for

11

Contractor B[5] and another PACE contractor (Contractor D). The CW stated that he withdrew $2,800 in cash from Company B's bank account and provided it to SACHDEVA during a December 2014 meeting at a McDonald's restaurant in Schaumburg, Illinois.

30. Company B bank records reflect a cash withdrawal of $2,800 on December 1, 2014.

31. E-mails provided by the CW also corroborate information provided by the CW regarding SACHDEVA and Contractor B. For example, on or about March 3, 2013, Contractor B e-mailed SACHDEVA at rajsach@gmail.com and attached Contractor B's resume. SACHDEVA forwarded the e-mail to the CW. On or about April 21, 2013, SACHDEVA, using rajsach@gmail.com, sent the CW two e-mails: (1) an e-mail with Contractor B's phone number; and (2) an e-mail that stated, "[CW], I spoke to [Contractor B] and he is okay for resume and good to go. Resume is enclosed. Thanks. Rajinder Sachdeva." In subsequent e-mail exchanges, the CW advised Contractor B that Contractor B was "all set to start at Pace," and Contractor B provided the CW with Contractor B's company name, address, and federal tax identification number.

32. On June 19, 2013, shortly after midnight, the CW responded to SACHDEVA's April 21, 2013 e-mail (*see* paragraph 30, above) and wrote in part:

> Raj, I did update the MSA [Master Services Agreement] – need to read thru this – will e-mail the MSA to [Contractor B] Wed/Thu night.

---

[5] This November 2014 payment for Contractor B appears to be made in addition to prior payments SACHDEVA received for Contractor B. *See* paragraphs 26-27.

33. On that same day, at approximately 6:41 a.m., SACHDEVA, using rajsach@gmail.com, responded:

> [CW] don't send an email on this email address I will send you text...bcz I use this one at office place [PACE] too.

Based on my training and experience and the investigation to date, I believe that SACHDEVA did not want e-mails sent to his gmail e-mail address that reflected his involvement with Company B and his involvement in placing the PACE IT consultants because he was concealing that information from PACE and he understood that PACE could review any e-mail accounts he accessed at work.

34. Around this time period, e-mails also reflect that Senryo approved Contractor B to provide IT support to PACE. In subsequent e-mails, the CW, using info@intelliorbit.com, sent timesheets and invoices for Contractor B's work at PACE to Senryo.

### SACHDEVA Directs Contractor C to Submit Invoices To PACE via Company B Using False Name

35. As set forth below, SACHDEVA also arranged for another contractor, Contractor C, to perform IT support services to PACE through employment at Company B. More specifically, Contractor C, a former PACE analyst supervised by SACHDEVA, submitted invoices to Company B using the false name "Sue Peters." Company B in turn submitted invoices to another outside vendor, Bourntec, which submitted the invoices to PACE. As with the other contractors, PACE paid the outside vendor for Contractor C's services, which in turn paid Company B, which paid a portion of the payment to Contractor C.

36. According to the CW, SACHDEVA had Contractor C use the name Sue Peters when Contractor C submitted timesheets for IT consulting work at PACE. The CW advised law enforcement that Contractor C e-mailed the CW and stated that SACHDEVA had arranged for her to work at Company B. The CW was not comfortable diverting money from Contractor C's PACE paychecks to SACHDEVA, as was done with Contractor B's PACE pay, and he conveyed his discomfort to SACHDEVA. The CW said SACHDEVA responded by telling the CW that SACHDEVA would not take a cut of Sue Peters' checks from PACE.

37. The CW also stated that Contractor C sent the CW a timesheet for her work at PACE so that Company B could bill Bourntec, which would then bill PACE. According to the CW, SACHDEVA found out that the timesheet was in Contractor C's name and informed the CW that the timesheet was supposed to be in the name of "Sue Peters." Shortly thereafter, Contractor C e-mailed the CW a revised timesheet in Sue Peters' name. The CW then issued an Company B invoice with the Sue Peters timesheet to Bourntec. The CW said that he subsequently received a check from Bourntec in the amount of $4,250 for the purported work of Sue Peters. According to the CW, SACHDEVA instructed the CW to issue the corresponding Company B check to Contractor C in the amount of $3,500, which the CW did.

38. The CW's e-mails corroborate the information provided by the CW regarding the Sue Peters invoices. Specifically, on April 21, 2014, SACHDEVA, using Rajinder.Sachdeva@Pacebus.com, e-mailed another PACE employee, copying

14

Contractor C and the CW, stating, "Request Gary team to create a user Susan Peters for technical remote support."

39.     On June 30, 2014, Contractor C, using her personal e-mail address, e-mailed the CW, who was using info@intelliorbit.com. In the e-mail, Contractor C provided the CW with her address and social security number and wrote: "Hi [CW], I spoke with Raj [SACHDEVA] and we agreed to do 1099 form for now. . . . Raj also asked me to sent [sic] you my timesheets. Regards, [Contractor C]." Contractor C also attached timesheets to the e-mail. The timesheets, which were on Bourntec letterhead, were for the last week of May 2014 and the month of June 2014 and represented that Contractor C worked a total of 50 hours during that time period. The timesheets reflected that the consultant's name was "[Contractor C]," and that PACE was the client. The timesheets were signed "[Contractor C]."

40.     On July 7, 2014, SACHDEVA, using rajnicnet@gmail.com, responded to Contractor C's June 30, 2014 e-mail (a recipient of which was the CW):

> [CW]: [Contractor C] need [sic] to submit the timesheet with Sue Peterson not [in name of Contractor C]. [Contractor C] send [sic] the other timesheet, Don't send the timesheet to Bourntec or Pace. Call me if you have any question.

41.     On July 9, 2014, Contractor C, using her personal e-mail address, sent an e-mail to the CW at info@intelliorbit.com, and attached what she referred to as the "corrected time sheets."[6] On July 25, 2014, the CW, using info@intelliorbit.com,

---

[6] Though the government does not currently have a copy of the attachment to the July 9, 2014 e-mail, based upon the information contained in the subsequent July 25, 2014 e-mail and based upon the investigation to date, I believe that the July 9 attachment contained timesheets in the name of "Sue Peters."

e-mailed a Bourntec employee and attached what was described as "Susan's time sheet for work at pace" – timesheets that reflected the same number of hours worked during May and June 2014 as reflected on the invoices Contractor C originally e-mailed the CW on June 30, 2014, when she was using her own name. However, the timesheets attached to the July 25, 2014 e-mail to Bourntec now identified the consultant as "Susan Peters" and were purportedly signed by "Susan Peters."

42.    According to the CW, when Company B received a check from Bourntec in the amount of $4,250 for Sue Peters' purported work, SACHDEVA instructed the CW to issue the corresponding Company B check to Contractor C in the amount of $3,500—thus allowing Company B to retain a profit of $750 for Consultant C's purported work at PACE. A review of Company B bank records reveals (1) a $4,250 credit in September 2014 from a Bourntec check, (2) a $3,500 debit in September 2014 from a check made out to Contractor C, and (3) no payments made to Sue Peters.

**SACHDEVA Objected to the CW Returning the Money to Bourntec**

43.    According to the CW, shortly after the CW issued a check to Contractor C for the Sue Peters billings, the CW told SACHDEVA that he was finished with Company B and that he was returning the Sue Peters money to Bourntec. I understood the CW to be uncomfortable paying Contractor C for work done under the false name of Sue Peters. SACHDEVA was not happy with the CW's decision

16

and tried to change the CW's mind. Ultimately, the CW returned the money to Bourntec.

44.    Consistent with that information, the bank records reflect a $4,250 debit from the Company B account on October 27, 2014 for a check to Bourntec Solutions. I obtained a copy of the Company B check, which is signed by the CW and reflects the following notation in the memo section: "return wrong payment."[7]

**Recorded January 23, 2015 Meeting Between SACHDEVA and the CW**

45.    At approximately 6:50 p.m. on January 23, 2015, the CW, in the presence of law enforcement, placed a consensually recorded telephone call to SACHDEVA. A brief telephone conversation in the Hindi language ensued. According to the CW, the CW and SACHDEVA agreed to meet at the McDonald's restaurant on Roselle and Weathersfield Roads in Schaumburg.[8]

46.    In anticipation of the meeting with SACHDEVA, I outfitted the CW with a recording device. I also observed the CW arrive in the McDonald's parking lot at approximately 7:20 p.m. and enter the restaurant at approximately 7:22 p.m.

---

[7] According to the CW, in early 2014, the CW told SACHDEVA that the CW wanted to shut down Company B. In response, SACHDEVA told the CW that he wanted his wife's name officially removed from the business (Company B), citing her existing affiliation with Aatek Consulting, which had received payments from Company B. However, SACHDEVA wanted the CW to keep Company B open so that SACHDEVA could continue billing for PACE contractors. The CW agreed with SACHDEVA and continued to operate Company B. The CW also returned SACHDEVA's $4,294 capital contribution (via two checks made out to SACHDEVA's wife), and did not include SACHDEVA's wife's name in the 2013 tax return for Company B. Based upon the investigation to date, I believe that SACHDEVA asked the CW to take these steps in order to further conceal his association with Company B while still using the business as a vehicle to receive a cut of PACE payments to certain contractors.

[8] The telephone conversation has yet to be translated.

At approximately 7:36 p.m., I observed SACHDEVA walk into the McDonald's parking lot and enter the restaurant. Several minutes later, I saw SACHDEVA[9] and the CW sitting at a table together inside the restaurant.

47. During the meeting, the CW and SACHDEVA discussed which tax form 1099s should be issued by Company B for 2014.[10] In prior years, Company B (via the CW) had issued form 1099s to Aatek Consulting, reflecting payments from Company B to Aatek Consulting during those years. During the meeting, SACHDEVA instructed the CW not to give SACHDEVA a 1099 for 2014. Referring to the money that had already been paid to Aatek Consulting or SACHDEVA's wife by Company B during 2014 for the PACE IT contractors, SACHDEVA suggested that the money could be explained as rent payments by Company B to SACHDEVA.[11] SACHDEVA said, "You have to pay my rent for the last two years so calculate that and your money came late and it was late." SACHDEVA later said, "This is clean I tell you. If you issue me a 1099, then that will be a problem. For

---

[9] I am familiar with SACHDEVA's appearance because I have viewed known photographs of SACHDEVA and I have conducted surveillance of SACHDEVA on other occasions.

[10] Unless otherwise noted, the recorded conversations summarized herein are primarily in the Hindi language. For these interceptions, I have relied on a draft—not final—English translation of conversations in Hindi done by interpreters employed by or contracted by the FBI, and by the CW. The voice identifications and my interpretations of these conversations are based on my knowledge of the investigation to date, the contents and context of the conversations, prior and subsequent conversations with the CW, and surveillance.

[11] According to the CW, Company B had an office for period of time, and then the office was closed in approximately 2012, and the furniture and computer equipment from the office was stored in SACHDEVA's basement. The CW stated that SACHDEVA, sometime after the office closed and possibly into 2013, infrequently e-mailed the CW invoices for rental fees of the basement storage space in amounts of $600 or $1,000; however, the CW does not recall making any payments on the invoices. Nor do the bank records reflect that such payments occurred. The CW said that SACHDEVA did not send him any invoices for rent during 2014.

rent, 1099 is never issued." To the extent that characterizing the prior payments as rent payments resulted in tax liabilities for Company B, SACHDEVA said, "I will give you cash in the amount whatever the tax amount would be." Later, the CW asked, "So you suggest to show your checks as rent basically, right?" SACHDEVA responded, "Show it as rental since that time." When the CW began questioning whether the high dollar amount paid to Aatek/SACHDEVA could be described as rent, SACHDEVA said, "Two thousand dollars per month . . . O yeah. I am getting 1800 for this. I am giving you this big of a house for commercial use[12] . . . your furniture is lying there. If someone comes, it is lying there and can take photos and the work is going on in the house."

48.     Several times during the meeting, SACHDEVA instructed the CW to close the Company B bank account, as SACHDEVA did not want one of his PACE employees, who was a good friend of the CW, to see any evidence of the account when he visited the CW's house. Specifically, the following exchange occurred:

SACHDEVA:     Close the bank account.

CW:     OK and if by chance there is an inquiry...

SACHDEVA:     Close the account first.

CW:     I will file tax and I will close bank account after filing tax.

---

[12] According to the CW, SACHDEVA and the CW closed the Company B office in approximately late 2011 or early 2012 and at that time they moved the Company B furniture and office equipment into SACHDEVA's basement. The equipment included approximately five or six tables, ten to twelve chairs, a computer server, five or six computers, a projector, and a projector screen. The CW stated that all of this furniture and computer equipment was stored in SACHDEVA's basement, not in his entire house, as SACHDEVA suggested during the January 23, 2015 meeting.

19

SACHDEVA:     Draw the money in cash and close the bank account.

CW:           OK.

SACHDEVA:     That is it. Take it and put it in your bank, put in your personal account and pay out from there. What is the problem?

CW:           OK. If, by chance, there is an inquiry conducted then what we . . what is our position? I mean how do we do, what do we do?

SACHDEVA:     Our position is, our position is that you have dealing with Raj... they will ask you if you have any dealing with Raj.

CW:           Huh, huh, huh.

SACHDEVA:     You say he got rent and there is nothing else.

CW:           OK.

SACHDEVA:     That is it. I had an office which was closed and I dumped [things] at Raj and I was paying him money for it, for his electricity and I used all the utilities there. That is it. That is my dealing with him. That is it.

CW:           Huh.

SACHDEVA:     Did Raj refer [Contractor B] to you? No, I know [Contractor B] and Dinkar [Dinkar Karumuri, who is the owner of Senryo] were looking for [IT support services][13] so I grabbed from the dock.

                              ***

CW:           Anything else we need to take care by closing the company?

SACHDEVA:     No. Close your bank account immediately, like tomorrow.

49.     Based on my training and experience and the investigation to date, I believe that SACHDEVA instructed the CW to falsely characterize the payments to

---

[13] As set forth in paragraphs 25 and 30, SACHDEVA referred Contractor B to Company B. In other words, when SACHDEVA said, "Did Raj refer [Contractor B] to you? No, I know [Contractor B] and Dinkar . . . ," he was instructing the CW to lie about SACHDEVA's referral of Contractor B if he was asked about it.

SACHDEVA as rent payments and to falsely claim that SACHDEVA did not refer Contractor B to Company B (and ultimately to Senryo and PACE) in order to obscure SACHDEVA's placement of IT contractors at PACE and conceal the financial benefits he received in return for those placements.

## CONCLUSION

50.    Based on the foregoing, there is probable cause to believe that RAJINDER SACHDEVA violated 18 U.S.C. § 666(a)(1)(B) by corruptly demanding, accepting, and agreeing to accept payments, intending to be influenced and rewarded in connection with the hiring and continued employment of IT contractors at PACE.

FURTHER AFFIANT SAYETH NOT.

DANIEL MCCUNE
Special    Agent,    Federal    Bureau    of
Investigation

SUBSCRIBED AND SWORN to before me on April 14, 2015.

SUSAN E. COX
United States Magistrate Judge

21